# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 98-3191/3970

_____

| | | |
|---|---|---|
| Charles E. Emmenegger; Robert F. Ritzie; James E. Riley, | * * * | |
| Appellees, | * * | |
| | * | Appeals from the United States |
| v. | * | District Court for the |
| | * | Eastern District of Missouri. |
| Bull Moose Tube Company; Caparo, Inc.; Bull Moose Tube, Ltd.; Swraj Paul, | * * * * | |
| Appellants. | * | |

_____

Submitted: June 17, 1999
Filed: November 24, 1999

_____

Before BOWMAN and HEANEY, Circuit Judges, and LONGSTAFF,[1] District Judge.

_____

BOWMAN, Circuit Judge.

Bull Moose Tube Company; Caparo, Inc.; Bull Moose Tube, Ltd.; and Swraj Paul (collectively, the Company), appeal from the judgment of the District Court entered in favor of Charles E. Emmenegger, Robert F. Ritzie, and James E. Riley on

_____

[1]The Honorable R. E. Longstaff, United States District Judge for the Southern District of Iowa, sitting by designation.

their claims for damages under ERISA.[2]  We affirm in part, vacate in part, and remand for further proceedings.

I.

We sketch the facts only briefly here, and refer the reader to the District Court's opinion in Emmenegger v. Bull Moose Tube Co., 13 F. Supp. 2d 980 (E.D. Mo. 1998), for the detailed factual findings of that court, which, to the extent such findings are relevant to our decision today, are not clearly erroneous.

Emmenegger, Ritzie, and Riley all were senior executives with Bull Moose Tube Company (BMT), a steel tube manufacturer and Missouri corporation, when BMT was acquired by Caparo, Inc., in 1988.[3]  This case concerns two BMT employee plans under which the plaintiffs claim benefits.  The first is a phantom stock plan (PSP) created around the time Caparo acquired BMT in order to give seven members of BMT's management, including the three plaintiffs, a financial interest in BMT without giving them an equity interest in the closely-held company.  As we will explain in more detail infra, the PSP provides that the shares of phantom stock shall be redeemed either for book value or for the higher redemption value, the amount to be determined by the circumstances and timing of the redemption.  The other plan at issue in this case is the

---

[2]Employee Retirement Income Security Act of 1974, Pub. L. No. 93-406, 88 Stat. 829 (codified as amended at 29 U.S.C. §§ 1001-1461 (1994 & Supp. III 1997) and in scattered sections of 26 U.S.C.).

[3]At the time of his termination in 1996, Riley was a vice-president of the newly-formed Caparo Steel Company, a related corporation.  Emmenegger and Ritzie also had management responsibilities at Caparo Steel up until the very end of their employment with BMT, even while continuing as executives at BMT.  The defendant companies and a number of other companies, many of them interrelated, are essentially controlled by Swraj Paul, the individual defendant.  For more detail on these companies, see the District Court's comprehensive opinion.

BMT severance plan, which since 1984 has provided for the payment of benefits to employees terminated in certain circumstances.

Over the years following the 1988 acquisition of BMT by Caparo, Inc., BMT enjoyed strong earnings. Notwithstanding this success, Emmenegger, Ritzie, and Riley all were terminated in March 1996. None received payment for any of his phantom stock, including the so-called Lichtfuss shares, stock that the plaintiffs allege was redistributed to them after it was redeemed by another original PSP participant.[4] Moreover, Emmenegger and Ritzie never received any severance benefits under the BMT severance plan. (Riley received benefits under the Caparo Steel severance plan, which is essentially identical to the BMT plan.) All three filed suit alleging various violations of ERISA and state law.[5] After a nine-day bench trial, the District Court entered judgment for the plaintiffs, awarding damages, with interest, to Emmenegger, Ritzie, and Riley on their ERISA claims relating to the redemption of their phantom stock shares (including the Lichtfuss shares) and to retaliatory discharge, and awarding damages, with interest, to Emmenegger and Ritzie on their ERISA claims for severance pay. The court also awarded costs and attorney fees to the plaintiffs. See Emmenegger v. Bull Moose Tube Co., 33 F. Supp. 2d 1127 (E.D. Mo. 1998). The Company appeals.

_____

[4]It is not clear to this Court why the Company has not yet paid the plaintiffs at least part of what they claim they are owed. In its brief, the Company acknowledges obligations due the plaintiffs under the PSP: "Note that defendants do not dispute that Emmenegger and Ritzie are entitled to book value for their phantom shares or that Riley is entitled to redemption value for his phantom shares." Brief of Appellants at 64 n.34. As far as we know, these admitted obligations remain unpaid.

[5]In their complaint, the plaintiffs included state-law counts alleging breach of the PSP by the Company. After the District Court determined that it had jurisdiction over the plaintiffs' ERISA claims, the Company sought dismissal of the state-law counts, arguing that they were preempted by ERISA. The District Court granted the Company's motion in a Memorandum and Order dated November 18, 1997.

II.

Initially, we must address the subject matter jurisdiction of the federal courts in this case. The Company argues, as it did in the District Court, that neither the PSP nor the BMT severance plan is an ERISA plan. Therefore, the Company contends, the plaintiffs' claims raise no federal questions and hence there is no federal subject matter jurisdiction.

The plaintiffs sought relief in federal court under 29 U.S.C. § 1132(a)(1)(B) (1994), which empowers "a participant or beneficiary" of an ERISA plan to bring a civil action "to recover benefits due to him under the terms of his plan." A "plan" is defined as "an employee welfare benefit plan or an employee pension benefit plan or a plan which is both." 29 U.S.C. § 1002(3) (1994). In ruling on the Company's pretrial motion to dismiss for lack of federal subject matter jurisdiction, the District Court concluded that the PSP is an employee pension benefit plan under ERISA and that the severance plan is an ERISA employee welfare benefit plan. See Emmenegger v. Bull Moose Tube Co., 953 F. Supp. 292 (E.D. Mo. 1997). The Company again raises the issue of subject matter jurisdiction on appeal. If the Company is correct, and the plans are not ERISA plans, there is no federal jurisdiction. See Kulinski v. Medtronic Bio-Medicus, Inc., 21 F.3d 254, 256 (8th Cir. 1994). We review these mixed questions of law and fact de novo. See id.

A. The Phantom Stock Plan

By its own terms, the PSP's purpose

is to promote the interests of the Corporations and their stockholder by aligning the interests of senior management of the Corporations with those of the stockholder, encouraging them to be employed by and to remain in the employ of the Corporations, providing them with additional incentives

-4-

for industry and efficiency and compensating them for services rendered to the Corporations.

Bull Moose Tube Co. Phantom Stock Plan (revised Feb. 21, 1991) (hereinafter Phantom Stock Plan) § 1.1. The redemption value of the phantom shares reflects the earnings performance of BMT, and the managers who received shares when the PSP was established were those responsible for such performance. By establishing a nexus between the shares' redemption value and management's achievements, the PSP gave the participants "a stake in the performance of the Corporations." Id. § 1.2.

The shares vested as to the original participants who were continuously employed by BMT (all three plaintiffs here) one-third at a time, on the first, second, and third anniversaries of the Award Date (October 18, 1988). See id. § 5.1. Once vested, shares became payable at "redemption value" (as modified in the case of a takeover) upon the happening of certain triggering events, such as retirement, disability, death, termination without cause, or takeover. See id. §§ 1.4, 3.1, 8.1, 8.3. In addition, original participants were permitted by the terms of the PSP to redeem their vested shares, at their option, anytime after October 19, 1993 (five years after implementation of the program), even if they were still employed by BMT. See id. § 8.3. If a participant were to be terminated for cause or to resign voluntarily, his shares would be redeemed only for "book value," an amount that was substantially less than redemption value at the time the plaintiffs left employment with BMT. See id. § 8.2.

The plaintiffs contend, and the District Court held, that the PSP is a pension plan within the meaning of ERISA. An employee pension benefit plan is defined by ERISA as "any plan, fund, or program . . . to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program -- (i) provides retirement income to employees, or (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond." 29 U.S.C. § 1002(2)(a) (1994). The Company argues that, because the PSP does not condition

redemption of PSP shares upon an employee's termination and because its purpose is not the deferral of income, it is not an ERISA plan but instead is properly characterized as a non-ERISA bonus program. By regulation, the Secretary of Labor has specifically excluded bonus programs from the definition of an employee pension benefit plan under ERISA. See 29 C.F.R. § 2510.3-2(c). The regulation provides that "payments made by an employer to some or all of its employees as bonuses for work performed" will not come within the definition of an ERISA plan "unless such payments are systematically deferred to the termination of covered employment or beyond, or so as to provide retirement income to employees." Upon examination of the record, and applying the law to the facts in this case, we hold that the PSP is not a pension plan within the meaning of ERISA, but an excepted bonus program.[6]

The PSP's statement of purpose describes an incentive plan, which also has the objectives of furthering the interests of BMT and its owner, encouraging selected managers to stay with BMT, and "compensating [those managers] for services rendered to" BMT. Phantom Stock Plan § 1.1. Under the rather complicated formulas used to

---

[6]The District Court's opinion answering the jurisdictional question and the plaintiffs' brief on appeal deal at length with the question of whether the PSP is a "top hat" plan. See Emmenegger v. Bull Moose Tube Co., 953 F. Supp. 292, 293-95 (E.D. Mo. 1997); Brief of Appellees at 38-44. A so-called "top hat" plan is unfunded, provides "deferred compensation for a select group of management or highly compensated employees," and is exempted from certain ERISA requirements. 29 U.S.C. §§ 1051(2) (participation and vesting), 1081(a)(3) (funding), 1101(a) (fiduciary responsibility) (1994). But a "top hat" plan must be an ERISA "plan" in the first instance. (In Dep't of Labor Op. No. 98-02A (Mar. 6, 1998), a representative of the Department of Labor agrees with that conclusion, noting that it is unnecessary to determine if an incentive plan is a top-hat plan, because the incentive plan is not a pension plan in the first instance.) We therefore focus our analysis on the broader question, which is determinative of the jurisdictional issue: is the PSP a pension plan within the meaning of ERISA? (There is no suggestion from either the parties or the District Court that the PSP might be a welfare plan, and our research convinces us that this is not a possibility.)

calculate the dollar value of a participant's shares at any given time, the redemption value of the phantom stock is tied inextricably to BMT's current performance.[7] The redemption value formula presupposes that, if the managers have done their jobs well, BMT's earnings will have been enhanced. In that situation, the shares will be more valuable to the managers. The PSP thus sets up a classic "bonus" situation: reward (higher cash value) for superior performance (higher corporate earnings).

Further, the shares, or more accurately the redemption thereof, cannot be characterized as "payments [that] are systematically deferred" to termination or "so as to provide retirement income." 29 C.F.R. § 2510.3-2(c). This is true whether one looks to the express language of the PSP or to the circumstances surrounding the program. It may be that the stock provides post-employment income for some eligible participants, especially if they do not opt to redeem their shares during their tenure with BMT. Nevertheless, the PSP has allowed vested participants, such as the plaintiffs, at their option, to redeem their shares -- for full redemption value -- *at any time* since October 1993 and for any reason. See McKinsey v. Sentry Ins., 986 F.2d 401, 406 (10th Cir. 1993) ("The plan permits a sales representative to withdraw the vested portion of her/his allocations at any time during the course of her/his employment; it does not provide for the *systematic* deferral of payment."). In this case, the record demonstrates that certain participants in the program redeemed shares while still employed by BMT, providing present income to those participants. There is no indication in the record that PSP redemptions were regularly deferred or that the program's purpose was to provide retirement income to the participants. Clearly, the PSP was designed with the hope that it would provide income to the participants, but it was not designed "systematically" to provide retirement income rather than present income.

---

[7]For details on the calculation of share value, see the Phantom Stock Plan's definitions of "Redemption Value" and "Book Value Per Share."

Though the PSP's vesting requirement could result in the deferral of a portion of any earned incentive until a participant's termination or retirement (as did the initial five-year delay in payout for original participants), such a deferral would only occur by happenstance. In fact, the stated purpose of the vesting requirement reinforces our conclusion that the PSP is a non-ERISA bonus plan. According to the PSP, "[t]he vesting schedule for awards, by conditioning awards upon continued service with the Corporations, seeks to insure continuity of management of the Corporations and *further relates awards to service* to the Corporations." Phantom Stock Plan at § 1.3 (emphasis added). The purpose of the vesting provision is to strengthen the connection between service and reward. The goal is not to defer payment to the participant until termination or retirement, and the record indicates that the vesting requirement in fact did not have that result. See Dep't of Labor Op. No. 84-12A (Feb. 23, 1984) ("[B]ecause the Plan does not condition distribution of the amount deferred [into phantom stock shares] upon termination of employment, retirement, or any other circumstances *other than the passage of a fixed period of time*, the Plan is not by its express terms an employee pension benefit plan within the meaning of . . . ERISA.") (emphasis added).[8]

While a participant may postpone his redemption of PSP shares until termination or retirement, this is strictly at the option of the participant, and there is nothing in the terms of the program that would result in such deferral with the purposeful consistency required to make deferral systematic. See Dep't of Labor Op. No. 98-02A (Mar. 6, 1998) (noting "surrounding circumstances" that may convert a plan that is a "bonus program" on its face into an ERISA pension plan, none of which are found in BMT's PSP). There are, for example, neither requirements set nor penalties threatened or

---

[8]In this opinion, we do not cite Department of Labor opinion letters as controlling authority. Nevertheless, we conclude that those portions of the letters to which we refer reflect a correct understanding of the law in this area. To that extent, they provide useful illustrations of the application of that law.

imposed for a participant's redemption of PSP shares before his termination or retirement, once the shares have vested (and after the initial five-year start-up period expired in 1993). Nothing in the terms of the PSP will regularly compel participants to wait until they leave BMT to cash in their shares. The most profitable moment for PSP participants to redeem their phantom shares does not depend upon when they end employment with BMT, but upon when BMT's earnings are at their highest point. Just as with the stock market, a participant might find it to his greater benefit to cash out his shares, at least in part, when he believes BMT's earnings may have peaked, rather than to hold on to them until he leaves BMT.

On these facts, we must hold that the PSP is not a pension plan within the meaning of ERISA. Therefore, there is no federal question jurisdiction under ERISA for the plaintiffs' claims for failure to pay benefits under the program. Likewise there is no federal question jurisdiction for the plaintiffs' ERISA claims under 29 U.S.C. § 1140 (1994) alleging retaliation for exercising rights under the PSP. Accordingly, we vacate the PSP portion of the District Court's judgment, dismiss the PSP portion of the appeal for lack of subject matter jurisdiction, and remand. The purposes of the remand are discussed in part IV of this opinion.

## B. The Severance Plan

The BMT severance plan, dated April 1, 1984, revised February 18, 1987, and attached as an exhibit to the plaintiffs' complaint, reads as follows:

> It is the Company's policy to provide severance pay to employees who are terminated for reasons other than disciplinary and who have given the Company excellent service during their employment at Bull Moose Tube.
>
> This policy is to serve as a guide to determine severance pay and provide consistency in the treatment of those good employees that deserve special attnetion [sic] at their termination of service.

These statements are followed by a table setting out "the maximum amount of severance pay to be granted," based on years of service. For those who qualify, the payment is to be made in a lump sum upon termination. The plaintiffs argue, and the District Court concluded, that the BMT severance plan is an employee welfare benefit plan governed by ERISA. After de novo review, we agree.

An "employee welfare benefit plan" is "any plan, fund, or program . . . to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants," inter alia, severance benefits. 29 U.S.C. § 1002(1)(B) (1994); see also Fort Halifax Packing Co. v. Coyne, 482 U.S. 1, 7 n.5 (1987) (explaining how severance benefits come within the definition of an employee welfare benefit plan). But not every policy that provides for the payment of severance benefits is necessarily an ERISA plan. As the Supreme Court has noted, ERISA was intended to provide for the federal regulation of *plans*, not merely *benefits*. See Fort Halifax, 482 U.S. at 11 (discussing ERISA preemption of state law). ERISA will be implicated, then, only if the benefits involved are administered according to a plan of some sort. In other words, ERISA regulates only those "benefits whose provision by nature requires an ongoing administrative program to meet the employer's obligation." Id. The parties disagree as to whether Emmenegger and Ritzie have made an adequate showing of an "ongoing administrative program" to implicate ERISA and thus to invoke the jurisdiction of the federal courts on their claims for severance benefits.

Fort Halifax is the seminal Supreme Court case on whether a severance plan is an ERISA-governed welfare benefit plan. The "plan" at issue in that case was a state statute that required employers to make severance-type payments to employees who lost their jobs as the result of a company's shutdown of a facility. A company would make payment -- if at all -- only once, on the occasion of a shutdown. The Court held that the state statute did not "relate to" an employee benefit plan because there was no ERISA "plan," and therefore the state law was not preempted by ERISA. Under the

BMT severance plan, however, no single event triggers a one-time payment of benefits to all participants. Employees eligible for benefits under BMT's plan might be terminated singly or in groups of indeterminate size. Terminations that qualify employees for severance benefits could take place at any time, and such terminations are likely to recur for as long as BMT has employees. See Tischmann v. ITT/Sheraton Corp., 145 F.3d 561, 566 (2d Cir.), cert. denied, 119 S. Ct. 406 (1998). The severance plan as written contemplates a continuing, albeit possibly sporadic, need for processing requests for benefits and making payments.

Further, benefits are to be paid only to those employees who are not terminated for disciplinary reasons and who also have given excellent service to BMT during their employment. Inquiry obviously is required into both the reason for the discharge and the history of the employee's service to BMT, and then judgments must be made. Were there not some discretion to be exercised, it would be unnecessary for the written policy "to serve as a guide to determine severance pay." Severance benefits are not to be awarded automatically and mechanically upon termination; the decision to pay benefits is made on an individual, ongoing basis, after exercising the discretion described in the plan. See Fontenot v. NL Indus., Inc., 953 F.2d 960, 963 (5th Cir. 1992) (noting that "severance plan requires no administrative scheme because those employees included in the plan were to receive benefits upon termination regardless of the reason for termination").

The Company would have us conclude that Emmenegger and Ritzie have made an insufficient showing of the required "ongoing administration" because they have done little more to create a record than submit a copy of the one-page plan. But having considered the plan, we do not see that any additional evidence is required, notwithstanding the brevity of the document describing the plan. On its face, the plan makes it clear that in each case someone must make an ad hoc judgment about the reason for the employee's termination and evaluate the quality of that person's service to BMT. We reject the suggestion that Emmenegger and Ritzie were required to show

who made such decisions and the thought process involved in those decisions in order to show the need for ongoing administration. Absent some indication in the record (and there is none) that severance payments were virtually automatic or that the standards set out in the plan for determining benefits were in practice disregarded, we cannot conclude that the decisions regarding eligibility for severance benefits and the amount of such benefits are made without the exercise of judgment as described in the plan. The document speaks for itself, as do the facts of this case: someone had to decide that Emmenegger and Ritzie were not eligible for severance benefits under BMT's plan, but that Riley was eligible under the identical terms of Caparo Steel's severance plan.

Although it is plain from the case law in this area that no single factor is determinative on this issue, we conclude, considering all the relevant circumstances, that Emmenegger and Ritzie have met their burden of proving that the severance plan is an employee welfare benefit plan under ERISA. Accordingly, the District Court properly exercised federal subject matter jurisdiction over the plaintiffs' ERISA claims for severance plan benefits.

III.

The Company does not specifically challenge the merits of the District Court's severance plan decision in its briefs on appeal, nor does it seek relief from that portion of the judgment (aside from its argument that the court lacked federal subject matter jurisdiction). See, e.g., Brief of Appellants at 82-83; Reply Brief of Appellants at 39 n.15. We now have determined that the District Court did not lack subject matter jurisdiction with respect to the claims made under the severance plan. As a result, the judgment for Emmenegger and Ritzie on their claims for severance benefits remains in place and cannot be challenged by the Company at some later time.

-12-

IV.

Anticipating our decision that the District Court had federal subject matter jurisdiction over the plaintiffs' claims for severance benefits but not over the plaintiffs' PSP claims, the parties have made suggestions to this Court regarding the course to be followed either in concluding the case ourselves or in instructing the District Court as to how it should go about disposing of the case on remand. Without exception, we think the issues raised should be addressed by the District Court in the first instance. But we do offer some observations, for whatever value they may have to that court and to the parties.

First, there is the question of whether the plaintiffs' ERISA claims for benefits under the PSP and for damages for retaliatory discharge can be recast as state-law claims. We note that the state-law claims originally in the plaintiffs' complaint were dismissed not because they failed to state a claim but because the District Court held that they were preempted by ERISA. Since the PSP is not an ERISA plan, there is no ERISA preemption of state-law claims relating to that plan. It will be for the District Court to decide, in its discretion (and upon the plaintiffs' motion), whether the complaint may be amended to incorporate state-law claims for benefits under the PSP and for damages for retaliatory discharge.

Assuming the plaintiffs' PSP claims can be revived, in whole or in part, as state-law counts, the question then becomes whether the District Court can exercise supplemental jurisdiction over them. The Company suggests that our affirmance of the District Court's exercise of federal subject matter jurisdiction over the severance-plan claims means that those claims have been "finally adjudicated" and hence there is no jurisdiction to supplement on remand. Reply Brief of Appellants at 39 n.15. We are not at all sure that the suggestion is correct. For one thing, the District Court will have before it the question of how much it should reduce the attorney fees it has awarded to the plaintiffs under ERISA. These fees must be reduced on remand in light of our

decision holding that the PSP claims are not ERISA claims. This fee-reducing exercise surely will present a "live" federal question. In addition, on remand the District Court will regain jurisdiction over its ERISA judgment for Emmenegger and Ritzie on their severance-plan claims. Accordingly, it seems likely to us that the District Court can, in its discretion, exercise supplemental jurisdiction over PSP-based state-law claims. See 28 U.S.C. § 1367 (1994); see also Pioneer Hi-Bred Int'l v. Holden Found. Seeds, Inc., 35 F.3d 1226, 1242 (8th Cir. 1994). Given the District Court's "vast expenditure of resources" on this case to date, it is hard to fathom how the District Court would abuse its "largely unrestricted" discretion by retaining jurisdiction over PSP-based state-law claims. Pioneer Hi-Bred Int'l, 35 F.3d at 1242 (citation to quoted case omitted). One needs only to read the District Court's detailed orders and opinions in this case, published and unpublished, and to consider the care with which the court has sorted out the complicated facts and reached its conclusions in order to know that it would be a colossal waste of the court's -- and the parties' -- time and effort if the District Court were unable to assume responsibility for the final disposition of any PSP-based state-law claims the plaintiffs may assert. See Cossette v. Minnesota Power & Light, 188 F.3d 964, 973 (8th Cir. 1999) (noting that discretion of district court in deciding whether to exercise supplemental jurisdiction "should be guided by considerations of judicial economy, convenience, and fairness to the litigants").

The Company also contends that, in any event, any PSP-based state-law claims asserted by Riley could not be adjudicated in federal court because he had no ERISA-based severance claim, since he was paid severance benefits upon his termination under the terms of the Caparo Steel severance plan. The Company cites Finley v. United States, 490 U.S. 545 (1989), for the proposition that "pendent party jurisdiction over parties as to which no basis for federal jurisdiction exists is improper." Reply Brief of Appellants at 39 n.15 (emphasis added). Since the 1990 enactment of 28 U.S.C. § 1367, Finley's continued viability on this point is open to doubt in the situation where, as here, the court's original jurisdiction is based on a federal question, not on the diversity of the parties. See Kaiser v. Memorial Blood Ctr., 977 F.2d 1280, 1283 n.1

-14-

(8th Cir. 1992); see also 28 U.S.C. § 1367(a) ("[S]upplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties."). Moreover, we note that Riley's ability to pursue his claims in the District Court may not turn on pendent party jurisdiction. If the court exercises supplemental jurisdiction over PSP-based state-law claims made by Emmenegger and Ritzie, then the question to be explored on remand likely would be intervention by Riley, either as of right or on a permissive basis, under Federal Rule of Civil Procedure 24.

The Company mentions that it would have a right to a jury trial on the state-law claims, and that the rationale for the District Court's exercise of supplemental jurisdiction would disappear if such a trial were held. The suggestion is that the goals of judicial economy, convenience, and fairness would not be furthered by having a jury trial in federal court on PSP-based state-law claims, as the litigation essentially would go back to square one. We presume that asserting a right to a jury trial is not idle talk and that the Company, having considered the wisdom of this strategy, really would prefer to have the facts of this case decided by a jury. Being familiar with the record created in the bench trial that already has occurred, we have doubts about the advisability of this strategy. But in any event, if the state-law claims must go before a jury, the District Court's intimate familiarity with this litigation almost certainly will result in a more expeditious conclusion to the case than one following a trial process begun anew in state court.

This case already has consumed large amounts of public and private resources. We have detected no apparent error in our review of the District Court's decision under ERISA on the merits of the PSP claims. In these circumstances, the District Court would appear to have a marked advantage in resolving PSP claims founded on state law in a timely and efficient manner.

V.

The District Court properly exercised federal subject matter jurisdiction over the ERISA claims of Emmenegger and Ritzie for severance benefits. The merits of the District Court's disposition of those claims have not been challenged in this appeal, and so the judgment for severance benefits must stand.

The judgment of the District Court as to all three plaintiffs' purported ERISA claims for PSP benefits and for damages for retaliatory discharge is vacated. Those purported ERISA claims and this appeal as to those claims are dismissed for lack of federal subject matter jurisdiction. The case is remanded to the District Court for further proceedings consistent with this opinion.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.